Opinion filed December 16, 2021



In The

# Eleventh Court of Appeals

_____

## No. 11-20-00030-CV

_____

## IN RE COMMITMENT OF JUSTIN ALLEN STRATTON

**On Appeal from the 385th District Court**
**Midland County, Texas**
**Trial Court Cause No. CV55427**

## O P I N I O N

In 2019, the State filed a petition to commit Appellant, Justin Allen Stratton, for involuntary treatment and supervision as a sexually violent predator pursuant to the Texas Civil Commitment of Sexually Violent Predators Act (the SVP Act). TEX. HEALTH & SAFETY CODE ANN. §§ 841.001–.153 (West Supp. 2021). The case proceeded to trial. After the parties rested and closed, the State moved for a directed verdict that Stratton is a sexually violent predator. The trial court granted the motion,

in part, and instructed the jury to find that Stratton is a *repeat* sexually violent *offender*, the first requisite element to finding that he is a sexually violent predator.

The parties then presented evidence as to the second statutory element—whether Stratton suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. The jury unanimously found, beyond a reasonable doubt, that Stratton is a sexually violent predator, necessarily finding that he did suffer from a behavioral abnormality. As a consequence, Stratton was civilly committed for treatment and supervision in accordance with the dictates of the Texas Health and Safety Code. *See id.*

Stratton raises five issues on appeal: (1) the evidence is legally insufficient to support the "repeat sexually violent offender" element of the State's case; (2) the evidence is factually insufficient to support the jury's behavioral abnormality finding; (3) the trial court erred when it admitted the findings and opinions of a non-testifying expert; (4) the trial court erred when it excluded Stratton's expert witness's testimony regarding legislative findings of the SVP Act; and (5) the trial court erred when it excluded Stratton's expert witness's deposition testimony under Rule 106 (the rule of remainder writings) or Rule 107 (the rule of optional completeness) of the Texas Rules of Evidence. For the reasons discussed below, we affirm the judgment of the trial court.

## I. *Factual Background*

Before the State petitioned to commit Stratton as a sexually violent predator, in 2015 he had pleaded guilty to two charges of aggravated sexual assault. Both offenses occurred within a few months of each other and under similar circumstances. Stratton was later convicted and sentenced for each offense on the same day.

The first aggravated sexual assault committed by Stratton was against a girl he knew and had dated previously.  They were both at a house party and Stratton was intoxicated.  According to the police report prepared by the investigating officer, Stratton initiated this assault when he grabbed the victim by the throat and physically pushed her against a wall.  He then threw her onto a bed and sexually assaulted her by penetrating her vaginally with his penis.  Stratton threatened that he would kill the victim and her family if she did not do what he asked.  At the time, Stratton was eighteen, and the victim was fifteen.

The second aggravated sexual assault committed by Stratton occurred a couple of months later.  Stratton met another teenage girl, a stranger to him, at a house party at the same home where the first assault had occurred.  According to the police report and the SANE report that were filed for this offense, Stratton and the victim flirted with each other and may have initially agreed to engage in consensual sex.  However, the reports state that when the victim refused to engage in anal sex with Stratton, he became violent.  He choked the victim from behind, which caused her to lose consciousness.  He then anally penetrated her while she was unconscious, and this caused blood to run down her legs.  He also bit the victim's lip ring and pulled it, which caused her lip to bleed.  Further, he vaginally penetrated her and shoved her face into a pillow to muffle her screams.

Other people at the party heard the assault occurring and opened the door to the bedroom where Stratton and the victim were located; however, Stratton slammed it shut.  The victim fought Stratton off and eventually escaped into the bathroom, where she locked herself inside.  Stratton threatened to "green light" her—to have her killed by a gang—if she told anyone what he had done to her.  Later during the party, the victim told her older sister what had occurred; several people then began searching for Stratton to confront him.  When Stratton was found, he was severely

intoxicated and unable to discuss what had occurred. Several witnesses reported to the police that Stratton did tell them that he had "done something bad" but that, after saying this, he immediately passed out from intoxication.

At the civil commitment trial, the State presented Dr. Jason Dunham, a forensic psychologist, as an expert witness. Stratton presented Dr. Marisa Mauro, also a forensic psychologist, as his expert witness. Stratton also testified. The experts presented conflicting opinions regarding whether Stratton suffered from a behavioral abnormality within the meaning of the SVP Act.

## II. *Civil Commitment of Sexually Violent Predators*

The SVP Act provides for the civil commitment of sexually violent predators based on legislative findings that "a small but extremely dangerous group of sexually violent predators exists and that those predators have a behavioral abnormality that is not amendable to traditional mental illness treatment modalities and that makes the predators likely to engage in repeated predatory acts of sexual violence." HEALTH & SAFETY § 841.001.

A civil commitment proceeding under the SVP Act incorporates the "beyond a reasonable doubt" burden of proof that is applicable to criminal cases. *In re Commitment of Fisher*, 164 S.W.3d 637, 641 (Tex. 2005). As such, to civilly commit a person under the SVP Act, the State must prove beyond a reasonable doubt that the person is a sexually violent predator. HEALTH & SAFETY § 841.062(a); *see also In re Commitment of Stuteville*, 463 S.W.3d 543, 551 (Tex. App.—Houston [1st Dist.] 2015, pet. denied). A person is a "sexually violent predator" if the person (1) is a *repeat* sexually violent *offender* and (2) suffers from a behavioral abnormality that makes the person likely to engage in a predatory act of sexual violence. HEALTH & SAFETY § 841.003(a).

4

Under the SVP Act, a person is a "repeat sexually violent offender" if he "is convicted of more than one sexually violent offense and a sentence is imposed for at least one of the offenses." *Id.* § 841.003(b). "Behavioral abnormality" means "a congenital or acquired condition that, by affecting a person's emotional or volitional capacity, predisposes the person to commit a sexually violent offense, to the extent that the person becomes a menace to the health and safety of another person." *Id.* § 841.002(2). "Whether a person suffers from a behavioral abnormality that makes the person likely to engage in a predatory act of sexual violence is a single, unified issue." *In re Commitment of Harris*, 541 S.W.3d 322, 328 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (citing *In re Commitment of Bohannan*, 388 S.W.3d 296, 303 (Tex. 2012)). The supreme court in *Bohannan* stated that the definition of behavioral abnormality could be more clearly defined as a "congenital or acquired predisposition, due to one's emotional or volitional capacity, to commit a sexually violent offense, to the extent that the person becomes a menace to the health and safety of another person." *Bohannan*, 388 S.W.3d at 303. Finally, "sexually violent offense" is defined in the SVP Act to include certain enumerated Penal Code offenses, including aggravated sexual assault, as well as offenses with substantially similar elements under prior state law or the law of other jurisdictions. *In re Commitment of Stoddard*, 619 S.W.3d 665, 669 n.1 (Tex. 2020); *see* HEALTH & SAFETY § 841.002(8)(A) (listing aggravated sexual assault as a sexually violent offense); TEX. PENAL CODE ANN. § 22.021 (West 2019).

### III. *Analysis*

#### A. *Partial Directed Verdict – Repeat Sexually Violent Offender*

In his first issue, Stratton contends that the evidence is legally insufficient to support the trial court's grant of a partial directed verdict that Stratton is a repeat sexually violent offender. Specifically, Stratton asserts that he is not a *repeat*

sexually violent *offender* because he was convicted and sentenced for both sexually violent offenses on the same day. We disagree.

We review the grant of a directed verdict in the light most favorable to the party against whom the verdict was rendered and disregard all contrary evidence and inferences. *In re Commitment of Talley*, 522 S.W.3d 742, 750 (Tex. App.—Houston [1st Dist.] 2017, no pet.). A directed verdict is warranted when the evidence is such that no other verdict can be reached and the moving party is entitled to judgment as a matter of law. *See Blackstone Med., Inc. v. Phoenix Surgicals, L.L.C.*, 470 S.W.3d 636, 645 (Tex. App.—Dallas 2015, no pet.).

Although a defendant has an absolute right to a jury trial in civil commitment cases under the SVP Act, *see* HEALTH & SAFETY § 841.061(b), this court and several of our sister courts of appeals have uniformly held that when the undisputed evidence establishes that the defendant has been convicted of more than one sexually violent offense and a sentence was imposed for one of them, a person's status as a *repeat* sexually violent *offender* becomes a legal determination that is appropriate for the grant of a partial directed verdict. *See In re Commitment of Decker*, No. 11-17-00007-CV, 2017 WL 2869847, at *3–*4 (Tex. App.—Eastland June 30, 2017, no pet.) (mem. op.) (holding that the trial court did not err when it granted a directed verdict on the repeat sexually violent offender element); *Harris*, 541 S.W.3d at 330 (same); *In re Commitment of Perdue*, 530 S.W.3d 750, 754 (Tex. App.—Fort Worth 2017, pet. denied) (same); *Talley*, 522 S.W.3d at 750–51 (same); *In re Commitment of Black*, 522 S.W.3d 2, 6 (Tex. App.—San Antonio 2017, pet. denied) (same); *In re Commitment of Lemmons*, No. 09-13-00346-CV, 2014 WL 1400671, at *3 (Tex. App.—Beaumont Apr. 10, 2014, pet. denied) (mem. op.) (same).

Here, the trial court granted a partial directed verdict in favor of the State and determined that Stratton is a repeat sexually violent offender because he had been

convicted of more than one sexually violent offense and a sentence was imposed for at least one of the offenses. The State offered two judgments of conviction, which the trial court admitted into evidence, that proved each of Stratton's prior aggravated sexual assault convictions and the sentences that were imposed. Further, Stratton testified and conceded that he had been convicted of and sentenced for both offenses. No other evidence in the record controverts these facts. Therefore, the State was entitled to a directed verdict on the first statutory civil commitment element (that Stratton is a r*epeat* sexually violent *offender*) as a matter of law. As such, the trial court did not err when it granted a partial directed verdict on this element. Accordingly, we overrule Stratton's first issue.

B. *Factual Sufficiency Review of the Jury's Behavioral Abnormality Finding*

In his second issue, Stratton contends that the evidence was factually insufficient to support the jury's finding that he suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. We disagree.[1]

Although SVP proceedings are civil in nature, the State's burden of proof is the same as in a criminal case (beyond a reasonable doubt). *Stoddard*, 619 S.W.3d at 674. In these cases, the evidentiary standard of review for factual sufficiency differs from the evaluation for legal sufficiency. A "factual-sufficiency review is premised on consideration of the entire record." *Stoddard*, 619 S.W.3d at 674 (citing *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). As in a legal sufficiency analysis, the assumption remains that the factfinder resolved disputed evidence in favor of its

---

[1]In support of his argument, Stratton explicitly relies upon the factual-sufficiency standard previously set forth by the Fort Worth Court of Appeals in *In re Commitment of Stoddard*, 601 S.W.3d 879, 891–92 (Tex. App.—Fort Worth, 2019), *rev'd*, 619 S.W.3d 665, 674–78 (Tex. 2020). The Texas Supreme Court has since rejected that approach. *See Stoddard*, 619 S.W.3d at 674–78. Therefore, we will analyze Stratton's factual-sufficiency argument under the standard adopted by the supreme court in *Stoddard*.

finding if a reasonable factfinder could do so. *Id.* However, disputed evidence that a reasonable factfinder could *not* have credited in favor of the finding is treated differently in a factual sufficiency analysis. *Id.* at 676. Thus, in sexually violent predator cases the standard governing a factual-sufficiency review of a finding that a person is a sexually violent predator is whether, in light of the entire record, the disputed evidence that a reasonable factfinder could *not* have credited in favor of the verdict, along with undisputed facts that do not support and are contrary to the verdict, is so significant that the factfinder could not have found beyond a reasonable doubt that the statutory elements were satisfied. *Id.* at 678. A reviewing court's mere disagreement with the factfinder's verdict "as to the proper evidentiary weight and credibility cannot be the basis of a reversal on factual-sufficiency grounds." *Id.* at 677.

As is often the situation in SVP cases, Stratton's commitment trial was a classic "battle of the experts," each of whom presented testimony that conflicted with the other. But the question before us is not the proper evidentiary weight or credibility to be afforded either expert; we defer to the jury on that basis. *Id.* Rather, our task is to evaluate the entire record to determine (1) what disputed evidence, if any, the jury could not credit in favor of the verdict and (2) whether, along with undisputed facts contrary to the verdict, the disputed evidence is so significant that the factfinder could not have concluded that the statutory requirements were satisfied beyond a reasonable doubt. *Id.* at 678.

### 1. *Dr. Dunham's Testimony*

We begin with the testimony of Dr. Dunham, the State's expert witness. Dr. Dunham ultimately opined that Stratton suffered from a behavioral abnormality and that he has a moderately high risk of reoffending.

Dr. Dunham holds a doctorate degree in counseling psychology and he completed a postdoctoral fellowship in forensic psychology in 2002. His practice focuses on forensic psychology, and he works in the private sector evaluating sex offenders and providing expert testimony in commitment proceedings. Dr. Dunham specializes in sex offender risk assessments and violence risk assessments; he has also performed numerous risk assessments for imprisoned inmates. Dr. Dunham has been licensed to practice forensic psychology in Texas since 2006 and he has performed 265 SVP evaluations in Texas.

After detailing his training and experience, Dr. Dunham explained that he became involved in Stratton's case after being retained by the State to evaluate Stratton's risk for committing a sexual offense in the future. Dr. Dunham testified that there is no standard test to determine if a person suffers from a behavioral abnormality. His evaluation of Stratton consisted of reviewing records, making necessary diagnoses, identifying risk factors and protective factors, completing a face-to-face interview with and testing of Stratton, and formulating his ultimate opinion. In his evaluation of Stratton, Dr. Dunham utilized a "clinically adjusted actuarial approach" methodology, an accepted standard in the field of forensic psychology, in which the practitioner adjusts his evaluation when he receives new and additional information as the case progresses.

The records that are typically reviewed by Dr. Dunham include court records, police records, interviews and tests conducted by other professionals, depositions, medical records, education records, and a parole summary. Other experts that conduct these evaluations rely on the same type of information. In this case, Dr. Dunham reviewed the evaluation of Stratton that was conducted by another, previous evaluator, Dr. Charles Woodrick. As part of the initial screening process to determine whether a person should be considered for civil commitment, the Texas

Department of Criminal Justice retains an evaluator—in this case Dr. Woodrick—to examine the person. *See* HEALTH & SAFETY §§ 841.022(b), .023(a). In his report, which Dr. Dunham reviewed and relied upon, Dr. Woodrick opined that Stratton suffers from a behavioral abnormality.

Dr. Dunham performed an extensive evaluation of Stratton in accordance with the accepted standards in the field of forensic psychology. He testified that research has identified certain risk factors that strongly correlate with a person's affinity to sexually reoffend. Here, Dr. Dunham identified numerous risk factors that were present in Stratton; the risk factors were assigned into two broad categories: (a) sexual deviancy and (b) antisocial orientation.

a. *Sexual Deviancy*

Dr. Dunham defined "sexual deviancy" as abnormal sexual behavior that, while not necessarily illegal, is contrary to societal norms. When the abnormal behavior reaches the level of deviance, it is an indicator that a person may be predisposed to committing a sexually violent offense. Dr. Dunham reviewed the records of Stratton's two previous sexual offenses and utilized the Static-99R, an actuarial measurement of a person's risk of sexually reoffending, to evaluate those offenses. The Static-99R measures ten risk factors that correlate with whether an offender is likely to reoffend. The test score of an average sex offender is two. According to Dr. Dunham, Stratton's test score was four, which placed Stratton in an "above average risk" category to be reconvicted for a sexual offense, when compared to the average sex offender.

Based on the results of the Static-99R assessment of Stratton's two previous aggravated sexual assault offenses, Dr. Dunham identified the following risk factors that applied to Stratton: (1) his young age; (2) that one of his previous sexually violent offenses was against a stranger; (3) that one of his previous sexually violent

10

offenses was against someone who was not his relative; (4) the impulsivity of his conduct; (5) that he was intoxicated when he offended; (6) that he offended in a public place or where he could easily be detected; and (7) that he used threats of violence and actually engaged in violent conduct when he offended. Although Dr. Dunham also identified as a risk factor that Stratton had a pattern of committing assaultive offenses, as shown by the assaults he committed against his multiple victims, he acknowledged that this risk factor was tempered somewhat because Stratton was sentenced for both offenses on the same date.

Stratton's young age at the time that he committed these offenses is a pertinent risk factor because a person's risk can decrease as he ages. However, according to Dr. Dunham, Stratton's risk would only begin to decrease at around age thirty-five. Stratton was eighteen at the time he committed these offenses, and twenty-three at the time the commitment action proceeded to trial. Dr. Dunham testified that sexual offenders who assault victims who are non-family members, and especially strangers, are considered to have a higher risk of reoffending in the future.

Dr. Dunham stated that Stratton's substance abuse was "an enormous risk factor for him" because he appeared to have a difficult time controlling himself when he was intoxicated and had shown a propensity for violence when he was intoxicated. He did not believe that Stratton sought out his victims to assault them, but rather that Stratton would become sexually impulsive, especially when intoxicated. This was significant to Dr. Dunham because when an offender sexually assaults his victim in a situation where he could easily be detected or caught, it is an indication of the offender's lack of ability to control his sexual urges and impulses.

Dr. Dunham diagnosed Stratton with polysubstance dependence, meaning that Stratton has a physiological dependence on multiple substances. For Stratton, this includes alcohol and drug use. As shown by his previous conduct, Stratton becomes

violent when he is intoxicated. Dr. Dunham stated that intoxication was the highest risk situation for Stratton and that he should avoid becoming intoxicated at all costs. But even if Stratton were to never use drugs or alcohol again, he would still have a behavioral abnormality; however, his risk would be lower. Importantly, Stratton had not received any substance abuse treatment, nor did he believe that he needed any. In fact, Stratton informed Dr. Dunham that it was his intention to use substances (drugs and alcohol) as soon as he is released from prison.

Dr. Dunham explained that the threat or use of violence or force was significant to a behavioral abnormality evaluation because it could be used to obtain compliance from the victim, as well as to keep a victim silent after an assaultive offense had occurred. Dr. Dunham further explained that a more violent assault would generally result in a higher level of sexual deviancy and a greater risk of reoffending.

Although Dr. Dunham did not initially make a diagnosis related to Stratton's sexual arousal to violence during a sexual encounter, he later provisionally diagnosed Stratton with sexual sadism. Sexual sadism, according to Dr. Dunham, is one's sexual arousal to the pain or humiliation that is experienced by another person. Dr. Dunham stated that, while he did not possess enough information to fully diagnose Stratton as a sexual sadist, he believed that "there is a decent chance that he is actually sexually aroused to the violence that he inflicts on people." In support of this, Dr. Dunham pointed to Stratton's testimony that he maintained an erection as he choked and bit his two sexual assault victims and that Stratton was "quite violent during both assaults."

In addition to the risk factors measured by the Static-99R assessment, Dr. Dunham also noted other "dynamic risk factors," risk factors that can change over time, that were present in Stratton. Dr. Dunham testified that, in his interview

with Stratton, Stratton demonstrated a lack of remorse toward his victims because he denied, despite having been twice convicted, that he had ever assaulted them. In fact, Stratton claimed that, in both instances, he did not choke the victims and that they had engaged in consensual sex only.

Stratton has not received any sex offender treatment, and he told Dr. Dunham that he did not believe that he needed any treatment, although he previously stated when deposed that he did. Dr. Dunham opined that this lack of insight posed a risk of reoffending because Stratton would not understand his high-risk situations, his triggers, and his offense cycle that led him to sexually offend previously; therefore, Stratton would not be able to institute safeguards, such as abstaining from alcohol or drugs, in order to protect himself and others.

b. *Antisocial Orientation*

Turning to the second broad category for risk of sexually reoffending, Dr. Dunham diagnosed Stratton with antisocial personality disorder—a chronic, lifelong disorder that a person develops in their adolescence and continues to manifest into their adulthood. Citing the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, Dr. Dunham explained that a person with this disorder violates the norms of society, has a lawbreaking behavior, engages in fights, and has a lack of concern for others. Further, this disorder is pervasive across domains, environments, and ages. To qualify under this definition, a person with this disorder must display antisocial behaviors by the time he is fifteen.

Dr. Dunham testified that Stratton exhibited numerous such behavioral characteristics before and after turning fifteen. For instance, Stratton began using drugs and alcohol around age ten or twelve. He was also suspended from school four or five times and was sent to live with his grandparents around the age of eight,

because he would steal and get in trouble at home and at school, and because he brought knives to school, got in fights, and was arrested for stealing.

After turning fifteen, Stratton continued to use and sell drugs, including methamphetamine, marihuana, and alcohol. And he committed the two aggravated sexual assault offenses when he was eighteen. Although his official affiliation with the Aryan Brotherhood gang was unclear, Stratton used his perceived affiliation with this gang to obtain compliance from victims when he engaged in criminal activity.

After Stratton was imprisoned for his aggravated sexual assault offenses, he, contrary to prison regulations, had numerous tattoos scribed to his body that depicted themes of white supremacy and the Aryan Brotherhood. Over the course of four years of incarceration, Stratton was cited thirty-three times for disciplinary violations, including the possession of weapons. Dr. Dunham testified that a person's behavior in prison is relevant to a personality disorder because it involves more recent behavior and because it occurs in a new and different domain or environment. He further stated that, in his experience, Stratton's excessive number of disciplinary violations while in prison was higher than the norm.

Multiple times, Stratton's behavior necessitated a "use of force" response from prison personnel; to obtain compliance from an inmate, correctional officers may, if necessary, use force to restrain or subdue a noncompliant inmate. The State offered, and the trial court admitted into evidence, a video of one such "use of force" instance. Dr. Dunham testified that, upon reviewing the video, he observed that Stratton appeared to enjoy the violent force that was used against him by the correctional officers. In fact, he appeared "jovial" and was "singing happy birthday to himself." Dr. Dunham stated that Stratton seemed to cherish the use-of-force

incidents and was excited by them. This behavior further supported Dr. Dunham's diagnosis of antisocial personality disorder.[2]

At the time of the commitment trial, Stratton was housed in administrative segregation. While there, he continued to commit disciplinary violations by assaulting and threatening correctional officers, and prison personnel were required to use force against him on three occasions. Although none of these disciplinary instances involved a sexually violent offense, Dr. Dunham testified that this absence did not negate the presence of a behavioral abnormality. Rather, according to Dr. Dunham, the prison domain is not representative of the victims, temptations, and high-risk situations that Stratton would be exposed to in the community outside of prison.

Dr. Dunham also administered the PCL-R test, which is a checklist that measures one's psychopathic personality, in his evaluation of Stratton. This test is also used to measure a person's antisocial orientation. Dr. Dunham testified that psychopathy is an elevation of antisocial personality disorder, which is an additional risk factor that is considered in the evaluation. People who are psychopathic and who have shown to have a history of sexual deviancy have a high correlation with reoffending in the future. The PCL-R test assesses twenty characteristics of psychopathy. Overall, Stratton's score on the PCL-R was 23.3, which falls within the "moderate" range of psychopathy. Dr. Dunham testified that although this score indicates that Stratton is not a true psychopath, all of the scores are simply a measure of severity. Further, Stratton's young age limits the test's accuracy because a psychopath's score would be expected to increase over time as the psychopath ages.

---

[2]Dr. Dunham also related the video to his provisional diagnosis of sexual sadism because, in addition to the evidence that Stratton maintained an erection while being violent with the two victims, the video indicated to Dr. Dunham that "there is a decent chance that [Stratton] is actually sexually aroused to the violence that he inflicts on people."

Dr. Dunham noted that he excluded two characteristics in the PCL-R assessment that were not applicable to Stratton because of his young age. However, according to Dr. Dunham, Stratton's score could increase over time because those factors would become relevant.

### c. *Protective Factors*

Finally, protective factors, such as increased age or substance abuse treatment, may reduce a person's risk of reoffending. Dr. Dunham testified that he did not identify any protective factors that applied to Stratton. Although employment can be a protective factor, Dr. Dunham stated that because Stratton committed the two aggravated sexual assaults while he was employed, Dr. Dunham did not consider his employment status to be a protective factor. Further, because family support may be a protective factor, Dr. Dunham stated that he was not sure what family support, if any, Stratton had received before committing the assaults.

In summary, based on his evaluation of Stratton, Dr. Dunham determined that Stratton possesses numerous sexual deviancy factors that indicated a risk to reoffend, including a propensity for intoxication, impulsivity, and violence in sexual assault settings. Further, Stratton had not received any substance abuse treatment or sexual offender treatment, despite being diagnosed with polysubstance dependency and having committed multiple aggravated sexual assaults. According to Dr. Dunham, Stratton had neither shown remorse nor acknowledged the commission of these offenses, even though he pleaded guilty to both. Dr. Dunham also diagnosed Stratton with antisocial personality disorder, concluded that Stratton scored as an above-average risk to sexually reoffend, and determined that Stratton possessed a moderate level of psychopathic traits. Ultimately, Dr. Dunham concluded that Stratton's risk to reoffend was moderately high and that Stratton suffered from a

behavioral abnormality as defined by the SVP Act that makes him likely to engage in a predatory act of sexual violence in the future.

### 2. *Dr. Mauro's Testimony*

Dr. Mauro, Stratton's retained expert witness, opined that Stratton does not suffer from a behavioral abnormality. Dr. Mauro is a forensic psychologist who has performed over two hundred SVP evaluations. Dr. Mauro holds a doctorate in psychology; she is also a licensed sex-offender-treatment provider. She maintains a private practice in Austin and provides expert testimony in civil and criminal commitment proceedings. Like Dr. Dunham, she has performed mental health assessments for sex offenders who were incarcerated, albeit primarily in the California prison system. In this case, Dr. Mauro used the same methodology, and relied on the same records, as Dr. Dunham in formulating her opinions.

Dr. Mauro testified that she did not believe that Stratton satisfies the criteria to be diagnosed with antisocial personality disorder. She stated that although she did not diagnose Stratton with this disorder, it would be reasonable for others to do so. Dr. Mauro believes that even though Stratton's conduct as a juvenile was somewhat indicative of the traits of antisocial personality disorder, his low socioeconomic class contributed to his behavior. She opined that Stratton had endured a difficult childhood, which included emotional and psychological abuse and neglect. According to Dr. Mauro, Stratton's background, young age, and fear of prison were the reasons for his antisocial behaviors that occurred before and during his incarceration.

Dr. Mauro did not diagnose Stratton with sexual sadism because she did not detect any indication that he had this type of persistent interest or preference. Dr. Mauro did not view the prison use-of-force video because she did not consider it relevant to her evaluation of Stratton in determining whether he is a sexual deviant

or possesses a behavioral abnormality. She did note, however, that a paraphilia diagnosis is not required to find that a person suffers from a behavioral abnormality.

Although Dr. Mauro did not diagnose Stratton with polysubstance abuse disorder, she did diagnose that he suffers from alcohol use disorder and marihuana or cannabis use disorder. She does not believe that any of these disorders are currently active because they manifested years ago and were in remission while he was in the controlled environment of prison. Further, Dr. Mauro did not find Stratton's use of substances while in prison to be a relevant consideration. Nevertheless, she did testify that, if Stratton returned to using drugs or alcohol after he is released from prison, he would become a greater risk to reoffend sexually.

Dr. Mauro identified what she considered to be pertinent risk and protective factors. In doing so, she utilized the Static-99R, Static-2002R, and PCL-R tests. Dr. Mauro agreed with Dr. Dunham's use and scoring assessment with the Static-99R. Stratton's score of four on that assessment assigned him to an "above average risk" to reoffend category. Of that group, ten to twelve percent were reconvicted within a five-year period, and a person with a score of four is expected to recidivate nearly two times as often as the typical sex offender. Dr. Mauro also assessed Stratton using the Static-2002R, which is a subsequent version of the Static instrument, because research suggests that it is more accurate to score both test versions and then average the predicted risks for sexual recidivism. According to Dr. Mauro, Stratton's score on the Static-2002R was a four. Dr. Mauro concluded that approximately ten percent of the group that Stratton was assigned to were reconvicted within five years.

Stratton scored a 15.8 on the PCL-R, which was significantly lower than the 23.3 score that was noted by Dr. Dunham. Dr. Mauro testified that she believes she and Dr. Dunham placed different emphases on different items, which explains the

disparities in the scores that they assessed. Irrespective of the scores, Dr. Mauro does not believe that Stratton is a psychopath, even though Dr. Dunham's score indicates that Stratton possesses significant psychopathic traits.

Ultimately, and based on her evaluation of Stratton, Dr. Mauro opined that Stratton does not have a behavioral abnormality and that he has a below-average risk to reoffend sexually. Additionally, she stated that she does not believe that Stratton would require sex offender treatment to prevent him from reoffending.

### 3. *Discussion*

We have carefully reviewed the entire record, which is extensive and well developed. In doing so, we hold that the disputed evidence a reasonable factfinder could not have credited in favor of the verdict, along with undisputed facts contrary to the verdict, is not so significant that the factfinder could not have found beyond a reasonable doubt that the statutory elements were met.

Because the trial court concluded, as a matter of law, that Stratton is a repeat sexually violent offender, the jury was only required to determine if Stratton suffers from a behavioral abnormality that would make him likely to engage in a predatory act of sexual violence. Drs. Dunham and Mauro agreed that Stratton presented an above average risk to reoffend according to the Static-99R instrument, which focuses on antisocial elements. Nevertheless, they disagreed about the importance or weight of some of the individual risk factors that were measured. Their opinions and diagnoses also conflicted.

Dr. Dunham diagnosed Stratton with (1) antisocial personality disorder and (2) polysubstance disorder. According to Dr. Dunham, the potential for substance abuse is an "enormous" risk factor for Stratton to reoffend because Stratton had indicated his intention to immediately resume abusing substances after he is released from prison. Dr. Dunham also provisionally diagnosed Stratton with sexual sadism.

19

Conversely, Dr. Mauro did not diagnose Stratton with antisocial personality disorder, sexual sadism, or polysubstance dependence; however, she did diagnose Stratton with alcohol abuse disorder and marihuana abuse disorder. Dr. Mauro believed that these disorders were in remission while Stratton was in a controlled prison environment, but that Stratton would be at a high risk to reoffend if he did use those substances.

According to Dr. Dunham, Stratton's score on the PCL-R was a 23.3, which is indicative of a "moderate" level of psychopathy. When tested by Dr. Mauro, Stratton's score was a 15.8. Although these test scores did not measure Stratton to be a true psychopath, Dr. Dunham believes that Stratton does present a moderate level of psychopathic traits.

Despite his history of violent sexual offenses, Stratton has received no sex offender treatment and does not believe that such treatment is necessary. Dr. Dunham identified this as a significant risk factor because Stratton will not have the awareness to modify his behavior and avoid situations that pose a high risk to reoffend. Conversely, Dr. Mauro believes that Stratton has a low risk to reoffend and does not need sex offender treatment.

Of the disputed evidence, the jury reasonably could not have credited Dr. Dunham's provisional diagnosis of sexual sadism in favor of the verdict. Nevertheless, there is sufficient and significant evidence in the record to support the jury's verdict that Stratton suffers from a behavioral abnormality. Although Dr. Dunham and Dr. Mauro presented conflicting testimony concerning whether Stratton has a behavioral abnormality, it is the factfinder's task to determine the weight and credibility of a witness's testimony, and we defer to the factfinder on those determinations. *Stoddard*, 619 S.W.3d at 675–76 (citing *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003)). Indeed, it is undisputed

20

that Stratton was not officially diagnosed as a psychopath and that he is serving sentences for his aggravated sexual offense convictions. Nevertheless, this undisputed evidence is not so significant in light of the entire record that the factfinder could not have found beyond a reasonable doubt that the statutory elements were met. *See id.* at 676.

Therefore, under the *Stoddard* standard of review, we hold that the evidence is factually sufficient to support the jury's verdict. In light of the entire record, the jury could have determined, beyond a reasonable doubt, that Stratton has a behavioral abnormality under the SVP Act and is a sexually violent predator. Accordingly, we overrule Stratton's second issue.

C. *Evidentiary Issues*

We review a trial court's evidentiary rulings in a commitment proceeding for an abuse of discretion. *In re Commitment of Mares*, 521 S.W.3d 64, 69 (Tex. App.— San Antonio 2017, pet. denied). A trial court abuses its discretion when it acts without regard for guiding rules or principles. *U-Haul Intern., Inc. v. Waldrip*, 380 S.W.3d 118, 132 (Tex. 2012) (citing *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998)). Because Stratton's third, fourth, and fifth issues all concern evidentiary rulings made by the trial court during the commitment trial, we review each ruling under this standard.

1. *Admissibility of Non-Testifying Expert's Opinion*

In his third issue, Stratton asserts that the trial court erred when it permitted Dr. Dunham to testify about the findings and opinion of Dr. Woodrick, the State's initial, multidisciplinary team evaluator, because (1) Stratton had no opportunity to cross-examine Dr. Woodrick, (2) Dr. Dunham's testimony about Dr. Woodrick's report was hearsay, (3) Dr. Woodrick's report was prepared in anticipation of litigation, and (4) the admission of Dr. Woodrick's opinion through Dr. Dunham

was fundamentally unfair and a violation of due process. We hold that the trial court did not abuse its discretion as Stratton claims.

The SVP Act specifically confers upon a person the right to cross-examine a witness who testifies against him. HEALTH & SAFETY § 841.061(d)(3); *see* TEX. R. EVID. 611(b). Nevertheless, in commitment cases that involved similar evidentiary disputes, our sister courts of appeals have uniformly held that the Rules of Evidence permit an expert witness to testify about a non-testifying expert's report or opinion that the offender suffers from a behavioral abnormality. *See, e.g.*, *In re Commitment of Jurischk*, No. 03-18-00670-CV, 2019 WL 2308594, at *6 (Tex. App.—Austin May 31, 2019, no pet.) (mem. op.); *In re Commitment of Sawyer*, No. 05-17-00516-CV, 2018 WL 3372924, at *6 (Tex. App.—Dallas July 11, 2018, pet. denied) (mem. op.); *In re Commitment of Winkle*, 434 S.W.3d 300, 315 (Tex. App.—Beaumont 2014, pet. denied); *accord In re Commitment of Barnes*, No. 04-17-00188-CV, 2018 WL 3861401, at *5 (Tex. App.—San Antonio Aug. 15, 2018, no pet.) (mem. op.); *In re Commitment of Carr*, No. 09-14-00156-CV, 2015 WL 1611949, at *2 (Tex. App.—Beaumont Apr. 9, 2015, no pet.) (mem. op.). We agree.

An expert witness may base his opinion on facts or data that he has reviewed or personally observed. TEX. R. EVID. 703. If experts in the particular field would reasonably rely on those types of facts or data in formulating an opinion on the subject, they need not be admissible for the opinion to be admitted. *Id.* Rule 705(a) permits a trial court to admit the underlying facts or data on which an expert has based an opinion. TEX. R. EVID. 705(a). Thus, when an expert relies upon hearsay in formulating his opinion, and the hearsay evidence is of a type that is reasonably relied upon by such experts, the jury is generally permitted to consider it. *See, e.g.*, *Barnes*, 2018 WL 3861401, at *4; *Sawyer*, 2018 WL 3372924, at *5; *Carr*, 2015 WL 1611949, at *2. However, if the underlying facts or data would otherwise be

inadmissible, the evidence should be excluded only if the probative value in assisting the jury to evaluate the opinion is outweighed by its prejudicial effect. TEX. R. EVID. 705(d). Moreover, the trial court may use a limiting instruction to ensure that otherwise inadmissible evidence is not improperly considered by the jury. *Id.*; *Barnes*, 2018 WL 3861401, at \*4; *Sawyer*, 2018 WL 3372924, at \*5.

The court in *Barnes* rejected the argument Stratton now advances, that the State erroneously used its testifying expert (Dr. Dunham) as a conduit for the admission of a non-testifying expert's opinion (Dr. Woodrick). *Barnes*, 2018 WL 3861401, at \*3. We also reject this argument. Notably, in *Barnes*, Dr. Dunham was the State's testifying expert and Dr. Woodrick was the initial evaluator. *Id.* at \*5. There, as in this case, Dr. Dunham testified that he relied upon the information and data contained in Dr. Woodrick's report. *Id.* Here, the trial court properly applied Rule 705(d) and included a limiting instruction in the trial court's charge which advised the jury that its use and consideration of any hearsay evidence was restricted solely for the purpose of showing the basis of Dr. Dunham's reliance on such evidence in formulating his opinions, and not for the truth of the matter asserted. Absent contrary evidence in the record, of which there is none, we presume that the jury followed the trial court's limiting instruction. *Id.* (citing *Mares*, 521 S.W.3d at 70).

The State offered Dr. Woodrick's opinion through Dr. Dunham for the sole purpose of explaining the bases of Dr. Dunham's expert opinions. Although Stratton complains that the State improperly used Dr. Dunham's testimony as a conduit to present additional expert opinions, the Rules of Evidence clearly permit the admission of Dr. Woodrick's opinion for the purposes that were offered by the State. Dr. Dunham testified that, in formulating his opinions, it is standard practice in these types of cases to review and rely on the data and reports that have been prepared by

previous evaluators. In this case, we find nothing in the record before us that indicates Dr. Woodrick's opinion was offered for the truth of the matter asserted or that the jury refused to follow the trial court's limiting instruction. Therefore, the trial court did not abuse its discretion when it permitted Dr. Dunham to testify about (1) the facts and data of Dr. Woodrick's report, upon which he relied to formulate his opinions, and (2) his ultimate opinion that Stratton suffers from a behavioral abnormality. TEX. R. EVID. 703, 705; *see Barnes*, 2018 WL 3861401, at \*4–6.

Further, even assuming arguendo that the trial court erred when it admitted the objected-to evidence, any such error would be harmless. *See Nissan Motor Co. v. Armstrong*, 145 S.W.3d 131, 144 (Tex. 2004). Based on the record before us, and in light of Stratton's prior convictions and Dr. Dunham's testimony that Stratton suffers from a behavioral abnormality that makes him likely to engage in predatory acts of violence, Stratton has not demonstrated that the jury's verdict turns on this particular evidentiary issue. *See Armstrong*, 145 S.W.3d at 144; TEX. R. APP. P. 44.1. Additionally, the trial court's limiting instruction cured any potential harm that the challenged testimony could have caused. *See Mares*, 521 S.W.3d at 71. Accordingly, we overrule Stratton's third issue.

### 2. *Legislative Findings*

In his fourth issue, Stratton complains that the trial court abused its discretion when it excluded relevant expert testimony from Dr. Mauro. The trial court sustained the State's objection to Dr. Mauro's proposed testimony regarding the legislative findings of the SVP Act, namely, the language regarding the "small but extremely dangerous group" that is intended to be the subject of the SVP Act. *See* HEALTH & SAFETY § 841.001. In an offer of proof, Dr. Mauro testified that she considered the above language in formulating her opinions because it was the stated purpose of the controlling law. Therefore, according to Dr. Mauro, she framed her

evaluation based on whether Stratton fell into that specified "group," although she acknowledged that proving such membership was not a component of the State's burden of proof.

Contrary to Stratton's argument, the supreme court has addressed the SVP Act's legislative-finding language and held that the "small but extremely dangerous group" language relied on by Stratton is not part of or included in the statutory definition of "sexually violent predator" and is not an element that the jury is required to consider or find in determining whether the offender suffers from a behavioral abnormality. *See Stoddard*, 619 S.W.3d at 677–78. The SVP Act sets forth the requirements for the civil commitment of a limited subset of offenders: those who commit "certain enumerated sexually violent offenses, are repeat offenders, and suffer from a behavioral abnormality that makes them likely to engage in a predatory act of sexual violence." *Id.* at 678. In other words, "the Act requires evidence of both repeat past sexually violent behavior and a present condition that creates a likelihood of such conduct in the future." *Id.*

We hold that the trial court did not abuse its discretion when it excluded Dr. Mauro's testimony regarding the legislative findings of the SVP Act because her testimony was not relevant to any commitment element that the jury would have been required to consider or determine. *See* TEX. R. EVID. 402 ("Irrelevant evidence is not admissible."). Accordingly, we overrule Stratton's fourth issue.

### 3. *Admissibility of Dr. Mauro's Deposition Testimony*

In his fifth issue, Stratton complains that the trial court erred when it excluded a portion of Dr. Mauro's deposition testimony under Rules of Evidence 106 and 107. Conversely, the State contends that Stratton failed to preserve this issue for our review.

During the State's cross-examination of Dr. Mauro, the State sought to impeach Dr. Mauro by introducing excerpts of her previous deposition testimony. Stratton then made an offer of proof regarding an excerpt of Dr. Mauro's deposition testimony that was related to the specific excerpts that the State used to impeach her. The excerpt that Stratton sought to introduce concerned Dr. Mauro's statements, as discussed above in Stratton's fourth issue, that she relied on the SVP Act's legislative findings in formulating her opinion of whether Stratton has a behavioral abnormality. On appeal, Stratton now contends that Dr. Mauro's deposition testimony regarding the SVP Act's legislative findings is admissible under either Rule 106 or Rule 107 and should not have been excluded.

Regardless of whether Stratton preserved this issue for our review, assuming that the trial court erred when it excluded this evidence—and we do not hold that it did—such error was harmless. First, even without her testimony regarding the SVP Act's legislative findings, Dr. Mauro was able to testify that, in her opinion, Stratton did not have a behavioral abnormality; she also testified at length as to the facts and data that she believed supported her opinion. *See Bohannan*, 388 S.W.3d at 305 ("In SVP commitment proceedings, the only fact issue to be resolved by the trier-of-fact is whether a person has the behavioral abnormality required for an SVP."). Second, the SVP Act's legislative findings are neither applicable nor relevant to the jury's determination and verdict in this case because the findings are not included in the statute's pertinent definitions and are not a necessary statutory element to establishing a basis for a civil commitment under the SVP Act, as we have discussed above. Therefore, the trial court's exclusion of Dr. Mauro's testimony regarding the SVP Act's legislative findings was not an abuse of discretion. Accordingly, we overrule Stratton's fifth issue.

## IV. *This Court's Ruling*

We affirm the judgment of the trial court.

W. STACY TROTTER

JUSTICE

December 16, 2021

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.